**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| AQUINAS JACKSON, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiff*,<br><br>v.<br><br>CLEO COMMUNICATIONS, INC. and DXC TECHNOLOGY SERVICES LLC,<br><br>*Defendants*. | Case No. 3:25-cv-50104<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Aquinas Jackson brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members") against Cleo Communications, Inc. ("Cleo") and DXC Technology Services LLC ("DXC" and collectively with Cleo "Defendants"), and alleges as follows, based upon information and belief, investigation of counsel, and the personal knowledge of Plaintiff.

**NATURE OF THE CASE**

1. This is a data breach case involving the unauthorized access and exfiltration of the sensitive Personal Information (PI) of countless individuals, including Plaintiff's and other Class Members. This is a "hub-and-spoke" data breach that involves a hub—a company that centralizes data—who stores data and facilitates data exchanges for numerous customers—the spokes.

2. The hub in this case is Defendant Cleo, a software platform that helps businesses manage their supply chain integration and provides tools to businesses for automating, integrating, and monitoring business-to-business transactions, among other services. In the course of providing

these services, Cleo stores an enormous amount of PII and generates millions of dollars of revenue on a yearly basis.

3. The spokes surrounding Cleo are Co-Defendant DXC—a multinational information technology services and consulting company—and at least 46-65 other affected, but unnamed entities, including Chemstar, Diaz Foods, and DLF North America.

4. In other words, the spokes are customers of Cleo who used its services and software, and in doing so, entrusted Cleo with the PII of their customers and employees. The volume of PII stored by the DXC on Cleo's systems and platform was enormous and, on information and belief, included a broad array of sensitive PI, including Social Security numbers, credit card information, and other sensitive, identifying information.

5. In February 2025, the notorious and Russia-linked ransomware group Cl0p took responsibility for a ransomware attack waged against Cleo and Defendant DXC, as well as dozens of Cleo's other customers (the "Data Breach"). Reportedly, Cl0p was able to exploit a known vulnerability in Cleo's systems and gain access to and exfiltrate the PII of a yet unknown number of individuals stored by Cleo's customers on Cleo's systems and platform.



DIRECTEX.NET - WILL BE PUBLISHED NEXT WEEK!!!
DLFNA.COM - WILL BE PUBLISHED NEXT WEEK!!!
DONLEN.COM - WILL BE PUBLISHED NEXT WEEK!!!
DUNDASJAFINE.COM - WILL BE PUBLISHED NEXT WEEK!!!
DXC.COM - WILL BE PUBLISHED NEXT WEEK!!!
DYNASTYFOOTWEAR.COM - WILL BE PUBLISHED NEXT WEEK!!!
D2GO.IO - WILL BE PUBLISHED NEXT WEEK!!!
DUNNRITEPRODUCTS.COM - WILL BE PUBLISHED NEXT WEEK!!!
DESIGNDESIGNINC.COM - WILL BE PUBLISHED NEXT WEEK!!!
DANA-CO.COM - WILL BE PUBLISHED NEXT WEEK!!!
DERRYTRANSPORT.COM - WILL BE PUBLISHED NEXT WEEK!!!
EDITEL.EU - WILL BE PUBLISHED NEXT WEEK!!! [1]

[1] Paulina Okunyte, Chicago Schools Join IT Gian in CL0p's Attack Spree, Cybernews (Feb. 13, 2025) https://cybernews.com/cybercrime/chicago-schools-dxc-technology-cl0p-ransomware/ ("Screenshot from Cl0p leak site on darkweb").

6. Cl0p has since listed the affected companies on their leak site on the dark web, claiming that the listed companies have "ignored" the notice and have not yet contacted the gang to pay ransom.

7. Notably, Cl0p distinguishes itself from other ransomware gangs through its unique approach to communication. Rather than reaching out to affected companies directly, the gang posts a message on its dark web platform, prompting victims to initiate contact. This strategy may be driven by the sheer volume of compromised organizations.

8. In general, Cl0p utilizes the ransomware-as-a-service (RaaS) model, allowing affiliates to use its ransomware software in exchange for a predetermined share of the ransom.

9. Cl0p was also responsible for the recent MOVEit hack campaign, in which the cybercriminals exploited a zero-day in Progress Software's MOVEit file transfer software to steal vast amounts of information from thousands of organizations.

10. Cl0p is known for employing a "double-extortion" tactic, in which it both encrypts and steals victim data. Normally, if the ransom is not paid, Cl0p not only refuses to restore access but also publishes the exfiltrated data on its leak site.

11. More specifically, the attacks implicated in the present Data Breach involve vulnerabilities affecting Cleo's software, including its Harmony, VLTrader, and LexiCom file transfer tools. Although Cl0p only more recently claimed credit for these attacks, attacks exploiting the flaws have been seen since December 3, 2024.[2]

12. On its Tor-based website, "CL0P^_-LEAKS", Cl0p wrote:

---

[2] Edward Kovacs, *RansomwareCVE Assigned to Cleo Vulnerability as Cl0p Ransomware Group Takes Credit for Exploitation*, SecurityWeek (Dec. 16, 2024) https://www.securityweek.com/cve-assigned-to-cleo-vulnerability-as-cl0p-ransomware-group-takes-credit-for-exploitation/

> ***Dear companies***
> ***Due to recent events (attack of CLEO)***
> ***all links to data of all companies will be disabled***
> ***and data will be permanently deleted from***
> ***servers.***
> ***We will work only with new companies***
> ***Happy New Year © CLoP^_***

[3]

13. The vulnerabilities reportedly allowed unauthenticated attackers to achieve remote code execution. In the attacks observed, the attackers have likely attempted to obtain files from organizations that have been using the vulnerable software, including Defendant DXC.

14. When news of exploitation broke, security firm Huntress reported that the attacks involved CVE-2024-50623, which Cleo attempted to patch in October but failed to properly do.[4] In December 2024, a new CVE ("common vulnerability and exposure") identifier, CVE-2024-55956, had been assigned and Harmony, VLTrader and LexiCom versions 5.8.0.24 were released to patch it. At the time, Cleo strongly urged customers to immediately update the software.

15. Expert analysis of the two CVEs published by Cleo determined that CVE-2024-55956 "is not a bypass of the former" but is rather a new unauthenticated file write vulnerability that has a different root cause than the initial CVE-2024-50623, which was an unauthenticated file read/write issue. Experts further stated that "Both security holes appear to have been exploited in the wild, which indicates that the attacks actually involved exploitation of a zero-day vulnerability."[5]

---

[3] *Id.*
[4] *Id.*
[5] *Id.*

16. These unauthenticated file issues were exploited by Cl0p in the recent Data Breach affecting Cleo and Cleo's customers, including Defendant DXC.

17. Several cybersecurity firms have published an analysis of the malware delivered in the Cleo attacks, describing it as a Java-based post-exploitation framework and RAT that enables the attackers to conduct reconnaissance, execute commands, and exfiltrate files. The malware is tracked as Malichus (Huntress) and Cleopatra (Arctic Wolf).[6]

18. The Data Breach occurred because Cleo and DXC failed to implement fundamental and basic security measures that could have prevented the Data Breach.

19. Implementing certain basic safeguards would have prevented the Data Breach.

20. Plaintiff and Class Members have been substantially injured by Defendants' data security failures. Cl0p acted with malicious intent to exfiltrate Plaintiff's PII for financial gain—Plaintiff further believes that his and Class Members' Private Information has or will be published for sale on the Dark Web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

21. Plaintiff has therefore suffered numerous injuries as a result of the Data Breach, including invasion of privacy, lost time and expenses spent mitigating the substantial risk of data misuse, the diminishment of value of his PII, and failing to receive the benefit of the bargain reached with Defendants.

22. Plaintiff brings this action to hold Defendants accountable for their data security failures, enjoin their lax data security practices, and recover damages and all other relief available at law on behalf of themselves and members of the classes they seek to represent.

[6] *Id.*

## PARTIES

### A. Defendant

23. Defendant Cleo Communications, Inc. is a privately held software company with its principal place of business in Rockford, Illinois.[7]

24. Defendant DXC Technology Services LLC is a Delaware limited liability company, headquartered in Ashburn, Virginia which has employees who reside in this District.[8]

25. Defendant DXC is a customer of Defendant Cleo and on information and belief used Cleo's compromised software.

### B. Plaintiff

26. Plaintiff Aquinas Jackson is a resident of San Antonio, Texas who was employed by Defendant DXC.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members, including Plaintiff, are citizens of a different state than Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

28. This Court has personal jurisdiction over Defendant Cleo because Cleo has its principal place of business in this District, and has personal jurisdiction over Defendant DXC because both Cleo and DXC conduct substantial business in this District, engaged in the conduct

---

[7] https://www.cleo.com/contact
[8] https://www.indeed.com/cmp/Dxc-Technology/locations/IL/Rockford

at issue here in this District, and/or otherwise have substantial contacts with this District and purposely availed themselves of the Courts in this District.

29. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District.

## FACTUAL ALLEGATIONS

### I. Cleo's Business

30. Cleo is a privately held software company founded in 1976. Cleo is best known for its ecosystem integration platform, Cleo Integration Cloud with RADAR.

31. Cleo describes itself as "powering supply chains of the world's leading organizations" through its varied offerings of business-to-business integrations.[9]

32. Cleo services are typically referred to as "Software as a Service" (SaaS), which refers to Cleo's software that allows its customers to connect to cloud-based apps over the internet.

33. Relevant here, Cleo offers "managed file transfer" or "MFT" services. Cleo's website states that it is: "#1 Rated MFT Solution for Automating, Simplifying, and Streamlining File Transfers."[10] Cleo states that its MFT solutions enable its customers to "move sensitive data" and that its MFT solutions are "secure" and "reliable."

34. Each of Cleo's customers, including Defendant DXC, stores PII of their consumers and/or employees on Cleo's platform through the use of Cleo's offered services and software.

35. Cleo's marketing demonstrates that it is well-aware that data security is a key feature of the services that it provides to its customers. The following examples illustrate how

[9] https://www.cleo.com/
[10] https://www.cleo.com/solutions/technology/mft-managed-file-transfer

Cleo's marketing highlights the strength of its data security practices as a selling point to its customers:

- Cleo advertises that its customers can "securely connect to your trading partners using top-rated integrations software" and lists numerous security protocols including LDAP, ICAP & SAML that give its customers "a competitive advantage."[11]

- Cleo also claims that it "is committed to providing high-quality products and services. Cleo Integration Cloud is secure and tested against industry standards and is designed for data security and process integrity."[12]

- Cleo lists several industry protocols it purports to support and be accredited in:

36. Cleo is also well-aware of industry guidance and regulations that set standards for effective data security practices. Cleo's marketing advertises that it is "tested against industry standards."[13]

37. Cleo also ironically published coverage of learnings that its customers could take away from "three massive data breaches" back in 2018, indicating that it was aware of the massive risk that data breaches posed to business like itself and its clients.[14]

[11] https://www.cleo.com/solutions/integration-connectors/security-protocols
[12] *Id.*
[13] *Id.*
[14] https://www.cleo.com/blog/data-breach

38. In the ordinary course of business, Cleo receives the PII of individuals, such as Plaintiff and the Class, from the entities and individuals that utilize Cleo's services and MFT software, including Defendant DXC.

39. Because cloud-based databases and MFT software are prime targets for cybercriminals due to the sheer volume of data they house and transfer, Cleo should have been well aware of the risks of a potential data breach. One recent report has highlighted the risks presented by cloud storage as follows:[15]

> It is estimated that more than 60% of the world's corporate data is stored in the cloud. That makes the cloud a very attractive target for hackers. In 2023, over 80% of data breaches involved data stored in the cloud. That is not just because the cloud is an attractive target. In many cases, it is also an easy target due to cloud misconfiguration – that is, companies unintentionally misuse the cloud, such as allowing excessively permissive cloud access, having unrestricted ports, and use unsecured backups.

## II. DXC Technology's Business

40. Defendant DXC is a leading global IT services and consulting company that provides a wide range of services including cloud computing, analytics, application development, cybersecurity, and IT outsourcing, essentially helping businesses manage and modernize their technology infrastructure through consulting and managed services. DXC was formed when the Enterprise Services division of Hewlett Packard Enterprise merged with Computer Sciences Corporation (CSC).

41. DXC employs 121,000 employees across 60 countries and over 200 technology partners.

[15] https://hbr.org/2024/02/why-data-breaches-spiked-in-2023

42. According to its website, "DXC Technology (NYSE: DXC) helps global companies run their mission-critical systems and operations while modernizing IT, optimizing data architectures, and ensuring security and scalability across public, private and hybrid clouds. The world's largest companies and public sector organizations trust DXC to deploy services to drive new levels of performance, competitiveness, and customer experience across their IT estates."[16]

43. Like Cleo, DXC's marketing demonstrates that it is well-aware that data security is a key feature of the services that it provides to its customers. The following examples illustrate how DXC marketing highlights the strength of its data security practices as a selling point to its customers:

- DXC has an entire page on its website dedicated to its security offerings in which it advertises that its "expert services and threat intelligence help you build in cybersecurity across your IT environment and operations" and help its customers "stay ahead of attackers and reduce risk."[17]

- DXC claims that "*Security is foundational to DXC*. We weave cyber resilience into your IT security, operations and culture. Whether you need help migrating to the cloud, protecting data with a Zero Trust strategy or managing your security operations center, we handle security so you can focus on your business."[18]

- DXC boasts that its 3,500+ security professionals providing advisory services, managed services, and third-party technologies as an end-to-end solution.[19]

44. DXC also ironically has a full portion of its webpage dedicated to how enterprises can defend against security breaches by quickly detecting, responding to, and remediating attacks.[20] Although DXC touts that it was named as a leader in cyber resiliency services in 2024, unfortunately, in the case of the instant Data Breach, it seems DXC failed to follow its own advice.

---

[16] https://dxc.com/us/en/about-us
[17] https://dxc.com/us/en/offerings/security
[18] *Id.*
[19] *Id.*
[20] https://dxc.com/us/en/offerings/security/cyber-defense

45. In the ordinary course of business, Defendant DXC receives the PII of individuals, from the entities and individuals that utilize DXC's services. Defendant DXC also receives the PII of its current and former employees. In turn, DXC entrusts this PII to its third-party vendors and service providers like Cleo.

46. DXC is a Cleo customer. DXC stores the PII of its consumers and employees on Cleo's software, network, and/or products and utilized Cleo's MFT services.

## III. DXC and Cleo obtain, collect, use, and derive a benefit from the PII of Plaintiff and Class Members.

47. Defendants obtain, collect, use, and derive a benefit from the PII of Plaintiff and Class Members. Defendants use the PII they collect to provide services, making a profit therefrom. Defendants would not be able to obtain revenue if not for the acceptance and use of Plaintiff's and the Class's PI.

48. By collecting Plaintiff's and the Class's PI, either directly or indirectly, Defendants assumed legal and equitable duties to Plaintiff and the Class to protect and safeguard their PII from unauthorized access and intrusion.

49. Defendants each recognize this duty. For example, DXC makes the following claim on its website regarding its protection of sensitive data:

> At DXC Technology (DXC) our commitment to privacy goes beyond the minimum legal and regulatory requirements. We strive for best-in-class data protection and privacy management; this requires a sound data privacy governance structure and an effective data privacy compliance and best practices program. With these measures, DXC aims to comply with ever-changing and increasingly complex regulatory standards; meet contractual privacy obligations; and build trust with our employees, customers, business partners and other stakeholders.[21]

[21] https://dxc.com/us/en/privacy

50. Cleo states on its website that: "We have organizational and technical processes and procedures in place to protect your personal information."[22]

51. Defendants' assurances of maintaining high standards of cybersecurity make it evident that Defendants recognized that they had a duty to use reasonable measures to protect the PII that they collected and maintained.

52. Defendants violated their own overt privacy statement and failed to adopt reasonable and appropriate security practices and procedures including administrative, physical security, and technical controls to safeguard Plaintiff's and Class Member's PI.

53. As a result, Plaintiff's and Class Members' PII was accessed and stolen from Defendants' inadequately secured data systems in a massive and preventable Data Breach orchestrated by Cl0p.

**IV. The Data Breach.**

54. In December 2024, the Cl0p ransomware group exploited critical vulnerabilities in Cleo's managed file transfer (MFT) software, notably CVE-2024-50623 and CVE-2024-55956, allowing for remote code execution and unauthorized data access. These vulnerabilities affected certain of Cleo's MFT software products including its Harmony, VLTrader, and LexiCom products, and Cleo's customers who used those products, like Defendant DXC.[23]

55. Although Cleo had earlier divulged this vulnerability in its MFT software in October 2024, it was ultimately revealed in December 2024 that its earlier attempts at security patches had failed—the vulnerabilities were still able to be (and in fact were still being) exploited by malicious actors.

---

[22] https://www.cleo.com/privacy-notice

[23] https://www.s-rminform.com/latest-thinking/cleo-software-data-theft-exploit-faq?utm_source=chatgpt.com

56. In early December, Cleo sent an urgent security alert to its customers, warning that critical vulnerabilities in its file transfer software were being actively exploited in the wild. Patches were made available, and weeks later, Cl0p began its extortion phase.

57. On December 16, 2024, Cl0p claimed responsibility for the Cleo attacks via a statement on their leak site which indicated victims' data would be posted over the coming days.

58. In mid-December 2024, Cl0p listed obfuscated names of 66 alleged victim organizations on their leak site, threatening to reveal their identities if ransom demands were not met.[24]

59. The names of these organizations were unveiled in mid-January 2025, along with a blog post which threatened to publish their data on January 18, 2025.

60. The specific vulnerability that was exploited allowed attackers to arbitrarily write files into directories on servers running the vulnerable software, including an 'autorun' directory, in order to execute the process and then automatically delete files. Using this vulnerability, experts described that attackers were able to:

> drop a .txt file into the 'autorun' folder which calls and processes other files held locally on the system. Attackers then drop a second file into another directory for processing by the 'autorun' function. This second file allows for arbitrary remote code execution, for example PowerShell commands with instructions to contact external IP addresses and download further files – such as malicious web shells – to gain a foothold on the server and begin post-exploitation activities, such as domain reconnaissance.[25]

61. In other words, these critical vulnerabilities in Cleo's software which Cleo failed to timely recognize, patch, and/or prevent enabled hackers like Cl0p to access and exfiltrate files that

---

[24] https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/?utm_source=chatgpt.com
[25] *Id.*

should have otherwise been protected by Cleo had Cleo implemented reasonable and adequate security measures in its products.

62. In or around February 2025, it became known that DXC was of one of the dozens of organizations whose networks were breached by Cl0p as a result of the above-described vulnerabilities that had been known, but not addressed, by Defendants.

63. Cl0p posted DXC to its data leak site on the dark web after DXC "ignored" Clop's demands for ransom.[26]

64. When a ransomware gang such as Cl0p attacks a corporate target, they generally employ a technique known as "double extortion." Under this technique, Cl0p will first steal data from the targeted network and will then encrypt files. This stolen data is used as leverage in its double extortion attacks, at which point Cl0p threatens that the compromised company's data will be leaked if a ransom is not paid.[27]

[26] https://www.scworld.com/brief/dozens-of-orgs-claimed-to-be-hacked-by-cl0pransomware.
[27] https://www.bleepingcomputer.com/news/security/clop-now-leaks-data-stolen-inmoveit-attacks-on-clearweb-sites/; https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/?utm_source=chatgpt.com




65. When a company whose network has been infiltrated by Cl0p tries to open a damaged file, the company instead sees a ransom demand note which informs the entity that their network has been compromised and the files have been encrypted. The note will inform them how to pay the ransom.[28]

66. For the companies that do not pay Cl0p's ransom demand, Cl0p will "leak" the data on the dark web for anyone to access and/or abuse freely.[29]

67. Cl0p's *modus operandi* is to steal highly sensitive PII including names, addresses, Social Security numbers or other government issued ID numbers, medical and insurance information, employee records like payroll data, financial account information, and tax information.

---

[28] https://heimdalsecurity.com/blog/clop-ransomware-overview/
[29] https://www.zerofox.com/intelligence-feed/flash-report-cl0p-publishes-data-of-cleo-compromise-victims/?utm_source=chatgpt.com

68. Security experts and law enforcement agencies generally advise against paying ransoms in cyberattacks, including those by Cl0p, because paying ransom encourages further criminal activity, provides no guarantee of data recovery, and can incentivize more attackers to target other victims.[30] Indeed, the FBI specifically advises against paying ransoms in ransomware attacks.[31]

69. DXC has yet to publicly acknowledge the Data Breach and provide notice of the Data Breach to the victims. However, as the victim of other data breaches in recent years, DXC should have been well aware of the risk of it being a target of a data breach and knew or should have known of the necessary steps it should have taken to avoid being the victim in the instant Data Breach.[32]

70. In light of the recent MOVEit breach which continues to be in the national media spotlight owing to its sheer size, Defendants should have been aware of the risk that MFT software was a valuable and highly desirable target for cybercriminals. Defendant DXC should have taken care to ensure that any MFT software in which it was entrusting sensitive PII was reasonably and adequately secure.

71. Ultimately, both Defendant Cleo and Defendant DXC failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' PII from unauthorized access and exploitation. The risk of ransomware attacks that perpetrated by Cl0p in the instant Data is or should have been well known to both Defendants. Many simple preventative measures could have been, but were not, taken by Cleo and DXC to prevent the Data Breach.

---

[30] Kyle Chin, *How to Prevent Ransomware Attacks: Top 10 Best Practices,* UpGuard (Jan 2, 2025) https://www.upguard.com/blog/best-practices-to-prevent-ransomware-attacks

[31] https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/ransomware#:~:text=If%20You're%20a%20Victim,a%20report%20at%20ic3.gov.

[32] https://dxc.com/us/en/newsroom/07292020

72. Defendants' actions represent a flagrant disregard of the rights of Plaintiff and the Class.

## V. Relevant Industry Standards and Regulations for Data Security

### A. United States Federal Trade Commission Guidelines

73. The United States Federal Trade Commission ("FTC") has issued numerous forms of guidance and taken enforcement action that are illustrative of the data security industry standards applicable to all Defendants.

74. Indeed, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of consumer PII violates the FTC Act's prohibition on "unfair or deceptive acts."[33]

75. In 2016, the FTC published guidance titled, *Protecting Personal Information: A Guide for Business* (the "FTC 2016 Guidance"). The FTC 2016 Guidance:

- Stresses the importance of "[c]ontrol[ling] access to sensitive information" and expressly encourages businesses to "[c]onsider using multi-factor authentication, such as requiring the use of a password and a code sent by different methods."[34]

- Emphasizes that companies should respond appropriately when credentials are compromised, providing that businesses should "[r]equire password changes when appropriate—for example, following a breach."

- Instructs companies to restrict data access privileges by "[s]cal[ing] down access to data" and ensuring that "each employee should have access only to those resources needed to do their particular job."[35]

- Warns companies that their data security practices depend on their personnel, which "includ[e] contractors" and encourages companies to

[33] See, e.g., In re Cap. One Consumer Data Sec. Breach Litig., 488 F. Supp. 3d 374, 407 (E.D. Va. 2020) (citing FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015)).

[34] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

[35] https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

"investigate [contractor] data security practices and compare their standards" and "verify compliance" with written security expectations.

- Recommends companies encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems and respond to security incidents.
- Advises companies not to maintain PII longer than necessary, not to collect more PII than necessary, to use industry-tested methods for data security, and monitor and respond to suspicious activity.

76. In 2021, the FTC amended its "Safeguards Rule" that applies to financial institutions, including retailers that issue their own credit card to consumers and companies that bring together buyers and sellers of products and services.[36] The Safeguard Rule expressly requires covered business to "[i]mplement multi-factor authentication for anyone accessing customer information on [the business's] system," to "[i]mplement and periodically review access controls [to] [d]etermine who has access to customer information and reconsider on a regular basis whether they still have a legitimate business need for it," and "[i]mplement procedures and controls to monitor when authorized users are accessing customer information on your system and detect unauthorized access."[37]

77. In February 2023, the FTC published an article titled, *Security Principles: Addressing underlying causes of risk in complex systems.* The article highlighted the importance of MFA, stating: "Multi-factor authentication is widely regarded as a critical security practice because it means a compromised password alone is not enough to take over someone's account."[38]

78. The FTC has also issued guidance for businesses regarding how to respond to data breaches, titled *Data Breach Response: A Guide for Business* (the "FTC Response Guidance").

---

[36] 16 C.F.R. § 314.2(h)(2)(i), (xiii).
[37] https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know
[38] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/02/security-principles-addressing-underlying-causes-risk-complex-systems

The FTC Response Guidance stresses the importance of providing individuals affected by a data breach with notice, explaining: "If you quickly notify people that their personal information has been compromised, they can take steps to reduce the chance that their information will be misused."[39] The guidance emphasizes that businesses should "[c]learly describe what you know about the compromise" and include "what information was taken." Notifying individuals as to the type of information that was compromised in the breach provides key information that allows them to "take steps to limit the damage."[40]

***B. Data Breaches Are Preventable***

79. Despite the growing body of publicly available information regarding the rise of ransomware attacks and other forms of cyberattacks that compromise PI, Defendants' approach to maintaining the privacy of Plaintiff's and Class Members' Private Information was inadequate, unreasonable, negligent, and reckless. Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information Defendants were maintaining and transferring for Plaintiff and Class Members, causing the exposure of PI, such as encrypting the information or deleting it when it is no longer needed.

80. In light of the national news surrounding the recent MOVEit data breach which affected thousands of U.S. companies, Defendants knew or should have known, that file transfer software has been increasingly targeted by cyberattacks.

81. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[41]

---

[39] https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business
[40] https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business
[41] Ransomware Prevention and Response, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Dec. 20, 2024).

82. Defendants could have prevented this Data Breach. Defendants could have and should have implemented measures—as recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including, but not limited to, the following recommendations:

- **Implement an awareness and training program**. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- **Enable strong spam filters** to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- **Scan all incoming and outgoing emails** to detect threats and filter executable files from reaching end users.

- **Configure firewalls** to block access to known malicious IP addresses.

- **Patch operating systems, software, and firmware on devices**. Consider using a centralized patch management system.

- **Set anti-virus and anti-malware programs to conduct regular scans automatically**. Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage the use of privileged accounts based on the principle of least privilege**: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- **Configure access controls**—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- **Disable macro scripts from office files transmitted via email**. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- **Implement Software Restriction Policies (SRP)** or other controls to prevent programs from executing from common ransomware locations,

such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop protocol (RDP)** if it is not being used.

- **Use application whitelisting**, which only allows systems to execute programs known and permitted by security policy.

- **Execute operating system environments or specific programs in a virtualized environment**. Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value** and implement physical and logical separation of networks and data for different organizational units.[42]

83. To prevent and detect cyberattacks and ransomware attacks, Defendants could and should have implemented the following preventive measures, as recommended by Microsoft's Threat Protection Intelligence Team:

- **Secure internet-facing assets**
    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audits
    - remove privileged credentials

- **Thoroughly investigate and remediate alerts**
    - Prioritize and treat commodity malware infections as potential full compromise

- **Include IT Pros in security discussions**
    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely

- **Build credential hygiene**

[42] *Id.*

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

- **Apply principle of least-privilege**

  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs
  - Analyze logon events

- **Harden infrastructure**

  - Use Windows Defender Firewall
  - Enable tamper protection
  - Enable cloud-delivered protection
  - Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[43]

84. Similarly, Defendants could and should have implemented measures—as also recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

- Know what personal information you have in your files and on your computers.
- Keep only what you need for your business.
- Protect the information that you keep.
- Properly dispose of information you no longer need. Create a plan to respond to security incidents.[44]

85. Finally, Defendants could and should have implemented the following measures—as also recommended by the United States Government—to prevent and detect cyberattacks and/or ransomware attacks, including the following recommendations:

---

[43] *See Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.
[44] Protecting Personal Information: A Guide for Business, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited, Jan. 14, 2025)

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions.** Prioritize timely patching of internet-facing servers-that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities….

- **Limit the use of RDP and other remote desktop services.** If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured, and security features are enabled**. For example, disable ports and protocols that are not being used for business purposes.[45]

86. Given that Defendants were collecting, storing, and transferring highly sensitive Private Information belonging to Plaintiff and Class Members, Defendants could and should have implemented all of the above measures to prevent and detect cyberattacks.

87. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks or ransomware attacks, resulting in the Data Breach and data thieves accessing and acquiring the PII of Plaintiff and hundreds of thousands of Class Members.

***C. Defendants Acquire, Collect, and Store Plaintiff's and Class Members' Private Information***

88. Defendants acquire, collect, and store a significant amount of PII belonging to Class Members.

---

[45] #StopRansomware Guide, https://www.cisa.gov/resources-tools/resources/stopransomware-guide (last visited, Dec. 5, 2024).

89. As a condition of their current or former employment or prospective employment, Plaintiff and Class Members were required to entrust their highly sensitive PII to Defendant DXC, and in turn either directly or indirectly to Defendant Cleo.

90. By obtaining, collecting, and using Plaintiff's and Class Members' PI, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII from disclosure.

91. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendants absent a promise to safeguard that information.

92. Upon information and belief, while collecting PII from Plaintiff and Class Members, Defendants promised to provide confidentiality and adequate security for their data through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

93. Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. The Data Breach occurred because Defendants failed to do so.

***D. Value of Private Information***

94. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[46] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other

[46] 17 C.F.R. § 248.201 (2013).

things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[47]

95. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[48]

96. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information at the point-of-sale in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, Social Security numbers, or other government issued identification numbers.

97. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

98. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.

---

[47] *Id.*

[48] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Dec. 10, 2024).

> As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[49]

99. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PI.

**E. Industry Standards Specific to Cloud Data Storage**

100. In addition to the general data security standards described above, numerous authorities have issued guidance specific to cloud data storage, defining the roles and responsibilities of cloud service providers (like Cleo) and customers (like DXC).

**i. Governmental Authorities**

101. In June 2020, the FTC published an article titled, *Six steps toward more secure cloud computing.* The article warned, "[a]s cloud computing has become business as usual for many businesses, frequent news reports about data breaches and other missteps should make companies think carefully about how they secure their data." The article expressly highlighted the importance of MFA in protecting consumer data stored on cloud services, recommending businesses: "Require multi-factor authentication and strong passwords to protect against the risk of unauthorized access."[50]

102. In March 2023, the FTC issued a Request for Information seeking public comment on "Business Practices of Cloud Computing Providers that Could Impact Competition and Data Security."[51] After reviewing over 100 public comments on the issue, the FTC published a report

---

[49] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf (last visited, Dec. 10, 2024).

[50] https://www.ftc.gov/business-guidance/blog/2020/06/six-steps-toward-more-secure-cloud-computing

[51] https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-seeks-comment-business-practices-cloud-computing-providers-could-impact-competition-data

in November 2023 titled, *Cloud Computing RFI: What we heard and learned.* The report expressly flagged the room for improvement in cloud security as follows: "[A] a number of commenters argued there is a great deal of room for improvement in cloud security; that default security configurations could be better; and that the "shared responsibility" model for cloud security often lacks clarity, which can lead to situations where neither the cloud provider nor the cloud customer implements necessary safeguards."[52]

103. In March 2024, the U.S. National Security Agency and Cybersecurity & Infrastructure Agency issued a joint publication titled, *Use Secure Cloud Identity and Access Management Practices.* The publication warned, "[a]s organizations continue to migrate to using cloud environments, these environments are becoming increasingly valuable targets for malicious cyber actors[.]" The publication made numerous recommendations relevant to MFA, rotating credentials, and restricting allow lists to ensure only necessary privileges are granted to users:

> - **Multifactor authentication.** Single-factor authentication (e.g., password or PIN only) based account access is susceptible to credential theft, forgery, and reuse across multiple systems. Cloud accounts are generally globally accessible; thus they are more susceptible to certain types of single-factor authentication weaknesses. Multifactor authentication (MFA) boosts account security, better resisting compromise by enhancing user verification methods. MFA requires two or more factors for login: something the user knows, has, or is. Typically this is implemented using a password and a second factor usually based on a randomly seeded numeric token, a biometric option (such as a fingerprint or facial recognition), or a physical token (unique hardware-based identifier: smartcard, Common Access Card, etc.).
>
> - Periodically audit IAM configurations to confirm only necessary privileges are granted to users. Many CSPs [Cloud Service Providers] offer services that will track unused privileges to help admins tailor accounts to the least privileges users need to accomplish their day-to-day responsibilities.

[52] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/11/cloud-computing-rfi-what-we-heard-learned

104. Also in March 2024, NSA separately issued a publication titled, *NSA's Top Ten Cloud Security Mitigation Strategies.* The publication emphasized the importance of MFA, credential rotation, and restricted allow lists as follows for customers using cloud data services as follows:[53]

> Proper identity and access management (IAM) are critical to securing cloud resources. Malicious actors can compromise accounts using phishing techniques, exposed credentials, or weak authentication practices to gain initial access into cloud tenants. They can also exploit overly broad access control policies to penetrate further into the environment, gaining access to sensitive resources. To prevent this, cloud users should use secure authentication methods such as phishing-resistant multifactor authentication (MFA) and properly managed temporary credentials. Access control policies should be carefully configured to ensure users are granted the least privileges necessary. Separation of duties should be implemented to protect especially sensitive operations and resources.

ii. **Industry Standards**

105. The PCI Data Security Council has issued an April 2018 supplement to the PCI DSS titled, *Cloud Computing Guidelines.*[54] The PCI Cloud Computing Guidelines again emphasize the importance of MFA, providing: "PCI DSS Requirement 8.2.2 requires multi-factor authentication for all remote network access to the CDE [cardholder data environment], and when public cloud services are part of a Customer's CDE, all such access will be considered remote access and will require multi-factor authentication.

106. The PCI Cloud Computing Guidelines includes a section titled *Intrusion Detection Systems (IDS) / Intrusion Prevention Systems (IPS)*, which provides: "As the Customer's access to network level data can be severely restricted in cloud environments, the responsibility for tracking intrusions at the network layer will often reside with the Provider, as the only entity that has

---

53 https://media.defense.gov/2024/Mar/07/2003407860/-1/-1/0/CSI-CloudTop10-Mitigation-Strategies.PDF

54 https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf

sufficient privileges to do this across the underlying infrastructure." The guidelines go on to note that for SaaS providers such as Cleo: "Since customer access to low level network traffic is impossible, it must rely on Providers for IDS/IPS, monitoring and alerting."[55]

107. The Center for Internet Security ("CIS") is a non-profit organization that develops globally recognized best practices for securing IT systems and data. In March 2022, CIS issued a publication titled, *CIS Controls Cloud Companion Guide* that provided guidance as on security best practices for customers using cloud services. The guidance made the following recommendations emphasizing the importance of MFA and revoking access to stale credentials:

- **Disable Dormant Accounts.** Delete or disable any dormant accounts after a period of 45 days of inactivity, where supported.

- **Establish an Access Revoking Process.** Establish and follow a process, preferably automated, for revoking access to enterprise assets, through disabling accounts immediately upon termination, rights revocation, or role change of a user. Disabling accounts, instead of deleting accounts, may be necessary to preserve audit trails.

- **Require MFA for Administrative Access.** Require MFA for all administrative access accounts, where supported, on all enterprise assets, whether managed on-site or through a third-party provider.

108. ISO/IEC 27017 is an international standard that "provides controls and implementation guidance for both cloud service providers and cloud service customers."[56] Control 9.2.3 specifically highlights that cloud service customers (like DXC) should use MFA and cloud service providers (like Cleo) should provide MFA capabilities as follows:

| **Cloud service customer** | **Cloud service provider** |
|---|---|
| The cloud service customer should use sufficient authentication techniques (e.g., multi-factor authentication) for authenticating the cloud service administrators of the cloud service customer to the administrative | The cloud service provider should provide sufficient authentication techniques for authenticating the cloud service administrators of the cloud service customer to the administrative capabilities of a cloud service, |

[55] https://listings.pcisecuritystandards.org/pdfs/PCI_SSC_Cloud_Guidelines_v3.pdf
[56] https://www.amnafzar.net/files/1/ISO%2027000/ISO%20IEC%2027017-2015.pdf

| | |
|---|---|
| capabilities of a cloud service according to the identified risks. | according to the identified risks. For example, the cloud service provider can provide multi-factor authentication capabilities or enable the use of third-party multi-factor authentication mechanisms. |

## VI. Defendants Each Owed a Duty of Care to Plaintiff and Class Members.

109. The PII of and Class Members was stored on Defendants' platform, network, systems or products at the time of the Data Breach.

110. Defendants owe a common law duties to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in Defendants' possession from being compromised, accessed, stolen, or misused by unauthorized parties.

### A. Defendant Cleo Breached its Duty of Care to Plaintiff and Class Members

111. Defendant Cleo's duty of reasonable care is established due to the nature of its business, which is to provide secure cloud data services, file transfer services, and store massive amounts of data, including Plaintiff's and Class Members' PI. Cleo therefore had a duty to exercise reasonable care in safeguarding Plaintiff's and Class Members' PI, as it was reasonably foreseeable that the failure to do so would cause them injury.

112. Cleo's duty of reasonable care is established by governmental regulations and industry guidance establishing industry standards for data security to safeguard PII stored on cloud platforms.

113. Cleo's duty of reasonable care is established by its own marketing statements, which hold out its cloud services as providing industry leading security solutions.

114. Cleo breached its duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII by failing to implement adequate data security practices, which caused the Data Breach.

115. At the time of the Data Breach, Cleo knew of the existing vulnerabilities in its MFT products that were ultimately exploited by Cl0p but failed to adequately patch and guard those vulnerabilities from exploitation.

116. It was feasible at the time of the Data Breach for Cleo to have fixed and resolved those vulnerabilities and automatically rolled out security patches to potentially affected customers.

117. Cleo, through these data security failings, was negligent and breached its duty of care to Plaintiff and Class Members to protect their PII implicated in the use of Cleo's file transfer products.

118. Cleo's breach of its duty of care caused the Data Breach, as had Cleo maintained adequate data security, the Data Breach could have been prevented.

119. Cleo's data security failings also constitute an unfair trade practice. As discussed above, the FTC's enforcement actions have established that a company's failure to maintain reasonable and appropriate data security of PII violates the FTC Act's prohibition on "unfair and deceptive acts."

120. Cleo's breach of its duty of care and engagement in unfair trade practices caused injury to Plaintiff and Class Members.

121. Cleo is liable for the injuries suffered by each Plaintiff and Class Member by virtue of its role as a data storage provider that stored the data of its affected customers, including Defendant DXC.

**B. Defendant DXC Breached its Duty of Care to Plaintiff and Class Members**

122. At the time of the Data Breach, DXC failed to maintain reasonable data security measures and comply with FTC guidance and other relevant industry standards. These data security failings included: DXC's failure to adequately oversee or select third party vendors in which it entrusted the PII of its consumers and employees. For example, even though Cleo made the vulnerabilities in its software products known as early as October 2024, DXC continued to use those products, in their unpatched and unsecure form.

123. DXC's data security failings enabled the Data Breach. Without these basic protections, Cl0p was able to exfiltrate the PII of Plaintiff and Class Members.

124. DXC's failings were particularly egregious given its claimed and advertised commitments to data security, and its history of experiencing other breaches in the past. DXC's failure to implement these basic data security measures is all the more inexplicable and reckless.

125. In addition, DXC violated the FTC Response Guidance by failing to give affected consumers sufficient information regarding the scale of the attack and the types of information taken insofar as DXC has yet to notify affected individuals, even though Cl0p made it known that DXC's data was compromised in the attack.

126. DXC, through these basic data security failings, breached its express representations in its Privacy Policy and Commitments, detailed earlier in the complaint.

127. In the alternative, DXC breached implied commitments to protect consumer PII made to consumers and employee's, including Plaintiff and DXC Class Members, by virtue of mandating that consumers and employees provide their sensitive PII as a condition of purchase.

128. DXC's basic data security failings also breached its duty of care to protect the PII of consumers and employees, which include Plaintiff and DXC Class Members.

### C. Plaintiff and DXC Class Members have suffered injuries as a result of the Data Breach.

129. Plaintiff and DXC Class Members have suffered the following forms of injury as a result of the Data Breach.

130. The Data Breach's disclosure of Plaintiff's and DXC's Class Members' PII has created a substantial risk that their data will be misused. This risk is demonstrated by the fact that cybercriminals like Cl0p now control that data.

131. Plaintiff and DXC Class Members have reasonably expended significant time and costs mitigating against the substantial risk of data misuse. These mitigation steps include that Plaintiff and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come

132. Plaintiff and DXC Class Members also suffered lost property value in their PII when it was allowed into the hands of the cybercriminal gang Cl0p which can freely sell or distribute their PII at any time.

133. DXC breached its express and implied contractual commitments to the Plaintiff and DXC Class Members to protect their PI.

134. The breach of a contractual obligation constitutes an injury to Plaintiff and DXC Class Members and provides a basis for a lawsuit to enforce the terms of the contract.

135. In breaching their contractual commitments, DXC further injured the Plaintiff and DXC Class Members by depriving them of the benefit-of-the-bargain they had reached.

136. For example, Plaintiff and DXC Class Members entered into employment contracts with DXC based on express and implied representations that their PII would be protected—which was factored into the value of that exchange. As DXC failed to maintain reasonable data security measures to protect that PI, they deprived Plaintiff and DXC Class Members of the benefit-of-the-bargain where they were owed the value of reasonable data security measures that were not provided.

137. In addition, the benefit-of-the-bargain approach ultimately seeks to place the non-breaching party in the same position they would have been had the contract been performed. Here, Plaintiff and DXC Class Members' PII is being trafficked on the dark web due to DXC's contractual breaches. As PII cannot be clawed back from the dark web, extended credit monitoring is an appropriate remedy to place Plaintiff and DXC Class Members in the same position they would have been in had DXC upheld its contractual obligations.

138. Plaintiff and DXC Class Members have also been injured by an invasion of their privacy rights. The disclosure of their PII to Cl0p and potentially others if and when Cl0p discloses it on the web involves personal information whose private nature was compromised by the Data Breach.

139. In addition, Plaintiff and DXC Class Members have suffered emotional distress and anxiety resulting from the Data Breach and fearing the substantial risk of identity theft and loss of privacy.

## VII. Plaintiff Jackson's Individual experience

140. Plaintiff Jackson is a former employee of Defendant DXC.

141. Upon information and belief Plaintiff's PII was stolen from Defendants' systems, networks, and/or software in the Data Breach.

142. Defendants were in possession of Plaintiff's PII before, during, and after the Data Breach.

143. Because of the Data Breach, Plaintiff Jackson's confidential PII is in the hands of cybercriminals as Cl0p has publicly confirmed it stole data from Defendant DXC's systems via the Cleo software vulnerabilities on its dark web leak site. As such, Plaintiff Jackson and other Class Members are at an imminent risk of identity theft and fraud.

144. As a result of the Data Breach, Plaintiff Jackson has already expended hours of his time and has suffered loss of productivity from taking time to address and attempt to ameliorate, mitigate, and address the future consequences of the Data Breach, including researching and verifying the legitimacy of the Data Breach.

145. Plaintiff Jackson places significant value on the security of his PII and does not readily disclose it. Plaintiff Jackson has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

146. Plaintiff Jackson has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for years to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII likely compromised by the Data Breach.

147. Plaintiff Jackson has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches. Absent Court intervention, Plaintiff's and the Class's Private Information will be wholly unprotected and at-risk of future data breaches.

148. Plaintiff suffered actual injury as a result of the unauthorized access and disclosure of his Private Information in the Data Breach including, but not limited to: (i) invasion of privacy;

(ii) disclosure and/or theft of his Private Information; (iii) lost or diminished value of his Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) nominal damages; and (vi) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect his Information.

149. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not informed Plaintiff of key details about the Data Breach's occurrence.

## VIII. Class Action Allegations as to Cleo

150. Plaintiff brings this action on his own behalf, and on behalf of the following Class (the "Cleo Class"):

> **Cleo Class.** All individuals residing in the United States whose PII was identified as compromised in the Data Breach.

151. Plaintiff's proposed class definitions against Cleo are inclusive of proposed national and state class definitions against DXC. For example, the Cleo Class includes the Class proposed for DXC.

152. Excluded from the Cleo Class are Cleo's officers, directors, and employees, any entity in which Cleo has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Cleo. Excluded also from the Cleo Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

153. Plaintiff reserves the right to amend or modify the definition of the Cleo Class or create additional subclasses as this case progresses.

154. **Numerosity.** The members of the Cleo Class are so numerous that joinder of all of them is impracticable. Public reporting presently indicates that there are over 60 companies whose data was implicated in the Data Breach.

155. **Commonality.** There are questions of fact and law common to the Cleo Class, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether Cleo had a duty to protect the PII of Plaintiff and Cleo Class Members, and whether it breached that duty.
- Whether Cleo knew or should have known that its data security practices were deficient.
- Whether Cleo's data security systems were consistent with industry standards prior to the Data Breach.
- Whether Plaintiff and Cleo Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, nominal damages, and/or injunctive relief.

156. **Typicality.** Plaintiff's claims are typical of those of other Cleo Class Members because the Plaintiff's PI, like that of every other Cleo Class Member, was compromised in the Data Breach

157. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interest of the Cleo Class Members. Plaintiff's Counsel are competent and experienced in litigating class actions.

158. **Predominance.** Cleo engaged in a common course of conduct toward the Plaintiff and Cleo Class Members, in that their data was stored on the same Cleo file transfer products and software and unlawfully accessed in the same manner. The common issues arising from Cleo's conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

159. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Cleo Class. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Cleo Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Cleo Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Cleo. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Cleo Class Member.

160. Cleo has acted on grounds that apply generally to the Cleo Class as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a classwide basis.

161. Likewise, particular issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such particular issues include, but are not limited to:

- Whether Cleo owed a legal duty to Plaintiff and Cleo Class Members to protect their PI.
- Whether Cleo's data security measures were inadequate in light of applicable regulations and industry standards.
- Whether Cleo's data security measures were negligent.

162. Finally, all members of the proposed Cleo Class are readily ascertainable. Both Cleo and DXC have access to the names and contact information of Cleo Class Members affected by the Data Breach.

## IX. Causes of Action as to Cleo

### A. Count I: Negligence (On behalf of the Plaintiff and the Cleo Class)

163. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

164. Cleo owed a duty under common law to Plaintiff and Cleo Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their PII in its possession from being compromised, stolen, or misused by unauthorized persons.

165. Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the PII of Plaintiff and Cleo Class Members relating to known vulnerabilities in any of its software products; (b) maintaining, testing, and monitoring Cleo's security systems to ensure that PII was adequately secured and protected; and (c) implementing intrusion detection systems and notifying customers of suspicious intrusions.

166. Cleo's duty to use reasonable care arose from several sources, including those set out below.

167. Cleo had a common law duty to prevent foreseeable harm to others. This duty existed because Cleo stored valuable PII that is routinely targeted by cyber criminals. Plaintiff and Cleo Class Members were the foreseeable and probably victims of any compromise to inadequate data security practices maintained by Cleo.

168. Cleo further assumed a duty of reasonable care in making representations in marketing materials that their data storage services were secure.

169. Cleo breached its duty owed to the Plaintiff and Cleo Class Members by failing to maintain adequate data security practices that conformed with industry standards, and were therefore negligent.

170. But for Cleo's negligence, the PII of the Plaintiff and Cleo Class Members would not have been stolen by cybercriminals in the Data Breach.

171. As a direct and proximate result of Cleo's breach of its duties, Plaintiff and Cleo Class Members have suffered injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

172. As a direct and proximate result of Cleo's negligence, Plaintiff and Cleo Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**VIII. Class Action Allegations as to DXC**

173. Plaintiff brings this action on his own behalf, and on behalf of the following DXC Class

> **DXC Class.** All current, former, and prospective DXC employees residing in the United States whose data was accessed or stolen in the Data Breach

174. Excluded from the DXC Class are DXC's officers, directors, and employees, any entity in which DXC has a controlling interest; and the affiliates, legal representatives, attorneys,

successors, heirs, and assigns of DXC. Excluded also from the DXC Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

175. Plaintiff reserves the right to amend or modify the definition of the DXC Class or create additional subclasses as this case progresses.

176. **Numerosity.** The members of the DXC Class are so numerous that joinder of all of them is impracticable.

177. **Commonality.** There are questions of fact and law common to the DXC Class, which predominate over individualized questions. These common questions of law and fact include, but are not limited to:

- Whether DXC had a duty to protect the PII of Plaintiff and DXC Class Members.
- Whether DXC breached express or implied commitments to protect the PII of Plaintiff and DXC Class Members.
- Whether DXC knew or should have known that its data security practices were deficient.
- Whether DXC's data security systems were consistent with industry standards prior to the Data Breach.
- Whether DXC's adequately disclosed details regarding the Data Breach to affected consumers and employees.
- Whether Plaintiff and DXC Class Members are entitled to actual damages, punitive damages, treble damages, statutory damages, nominal damages, and/or injunctive relief.

178. **Typicality.** Plaintiff's claims are typical of those of other DXC Class Members because Plaintiff's PI, like that of every other Class Member, was compromised in the Data Breach

179. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interest of the DXC Class Members. Plaintiff's Counsel are competent and experienced in litigating class actions.

180. **Predominance.** DXC has engaged in a common course of conduct toward the Plaintiff and DXC Class Members, in that all the data of Plaintiff and DXC Class Members were compromised via the same Cleo software products and unlawfully accessed in the same manner. The common issues arising from DXC's conduct affecting Class Members listed above predominate over any individualized issues. Adjudication of these common issues in a single action will advance judicial economy.

181. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the claims of the DXC Class. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most DXC Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual DXC Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for DXC. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each DXC Class Member.

182. DXC has acted on grounds that apply generally to the DXC Class as a whole such that class certification, injunctive relief, and declaratory relief are appropriate on a classwide basis.

183. Likewise, particular issues are appropriate for certification because such claims present common issues whose resolution would advance the disposition of this matter. Such particular issues include, but are not limited to:

- Whether DXC owed a legal duty to Plaintiff and DXC Class Members to protect their PI.

- Whether DXC's data security measures were inadequate in light of applicable regulations and industry standards.
- Whether DXC's data security measures were negligent.
- Whether DXC's breached express or implied representations to the Plaintiff and DXC Class Members regarding the protection of their PI.

184. Finally, all members of the proposed DXC Class are readily ascertainable. DXC have access to the names and contact information of DXC Class Members affected by the Data Breach.

**I. Causes of Action as to DXC**

**B. Count I: Breach of Implied Contract (in the alternative to Count I) (On behalf of Plaintiff and the DXC Class)**

185. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

186. As a condition of employment with DXC, DXC required the Plaintiff and DXC Class Members to provide their PI.

187. In mandating that Plaintiff and DXC Class Members provide their PII as a condition of employment, DXC implied an assent to safeguard and protect their PI.

188. Plaintiff and DXC Class Members would not have provided their PII to DXC had they known that DXC would not safeguard their PII as promised.

189. Plaintiff and DXC Class Members fully performed their obligations under their implied contracts with DXC.

190. DXC breached their implied contracts with the Plaintiff and DXC Class Members by failing to safeguard their PI.

191. As a direct and proximate result of DXC's breach of implied contract, Plaintiff and DXC Class Members have suffered injuries in fact including (i) invasion of privacy; (ii) theft of

their Private Information; (iii) lost or diminished value of their Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

192. As a direct and proximate result of DXC's breach of implied contract, Plaintiff and DXC Class Members are entitled to damages, including compensatory damages, punitive damages, and/or nominal damages, in an amount to be proven at trial.

### C. Count II: Negligence
**(On behalf of the Plaintiff and the** DXC **Class)**

193. Plaintiff repeats and re-alleges the factual allegations above as if fully set forth herein.

194. DXC owed a duty under common law to Plaintiff and DXC Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting their PII in its possession and preventing Plaintiff's and DXC Class Members' PII from being compromised, stolen, or misused by unauthorized persons.

195. Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the PII of Plaintiff and DXC Class Members; (b) maintaining, testing, and monitoring DXC's security systems to ensure that PII was adequately secured and protected; (c) timely acting upon warnings and alerts to respond to intrusions; (d)

ensuring any third party software products in which they entrusted Plaintiff and DXC Class Member's PII was adequately and reasonably secure and was not vulnerable to exploitation; and (e) adequately notifying Plaintiff and DXC Class Members about the types of data that were compromised in the Data Breach.

196. DXC's duty to use reasonable care arose from several sources, including those set out below.

197. DXC had a common law duty to prevent foreseeable harm to others. This duty existed because DXC collected and stored valuable PII that is routinely targeted by cyber criminals. Plaintiff and DXC Class Members were the foreseeable and probably victims of any compromise to inadequate data security practices maintained by DXC

198. DXC further assumed a duty of reasonable care in promulgating its Privacy Policy which assured the Plaintiff and DXC Class Members that their PII would be adequately secured.

199. DXC breached its duties owed to the Plaintiff and DXC Class Members by failing to maintain adequate data security practices that conformed with industry standards, and were therefore negligent.

200. DXC breached its duties owed to Plaintiff and DXC Class Members by failing to ensure any third party software it used in which it entrusted Plaintiff and DXC Class Members' PII was adequately and reasonably secure.

201. But for DXC's negligence, the PII of the DXC Class Members' and Plaintiff would not have been stolen by cybercriminals in the Data Breach.

1. As a direct and proximate result of DXC's breach of duties, Plaintiff and DXC Class Members have suffered injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of their Private Information;

(iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) actual misuse of the compromised data consisting of an increase in spam calls, texts, and/or emails; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

202. As a direct and proximate result of DXC's negligence, Plaintiff and DXC Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying the Class, and appointing Plaintiff and his Counsel to represent the Class;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendants to delete, destroy, and purge the PII of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PI, for Plaintiff's and Class Members' respective lifetimes;

v. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendants to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

x. requiring Defendants to conduct regular database scanning and securing checks;

xi. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PI, as well as protecting the PII of Plaintiff and Class Members;

xii. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting Private Information;

xiv. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor

Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to unauthorized third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, statutory, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: March 11, 2025

Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: (866) 252-0878
gklinger@milberg.com

***Attorney for Plaintiff and the Putative Class***